Good morning, Your Honors. Timothy Presso for the Plaintiff Appellants. I'd like to reserve three minutes of my time for rebuttal. That's fine. May it please the Court, the plaintiffs in this case challenged the repeal of the 2001 roadless rule in the State of Idaho and its replacement with the Idaho roadless rule. In promulgating the Idaho rule, the U.S. Forest Service made a regulatory change for the specific purpose of adding new flexibility to undertake road construction and logging projects across 5.7 million acres of public roadless lands. But when it came to evaluating and disclosing the environmental impacts of that regulatory change, the Forest Service and the Fish and Wildlife Service repeatedly assumed that the Idaho rule's new development authorizations wouldn't mean anything on the ground, and that experience under the more protective 2001 rule would continue. In so doing, these agencies trivialized the policy decision to discard the landmark 2001 rule and violated federal environmental laws. I'd like to begin with the plaintiff's claims under the National Environmental Policy Act, and specifically our claims concerning the backcountry category of the Idaho rule, which affects 5.3 million acres of the bulk of the lands at issue. The backcountry provision repeated all of the 2001 rule's exceptions for road construction and logging, and then added two more. First, it freely allowed road construction and logging in a 442,000-acre zone extending about a mile and a half from communities. But in addition, it allowed road construction and logging miles away from communities, deep in the backcountry, under a malleable significant risk standard that was specifically promulgated for the purpose of loosening the 2001 rule's provisions. What's the problem with that? I'm sorry, Your Honor. You're allowed to loosen provisions? You're absolutely allowed to loosen provisions, Your Honor, but you also have to disclose and evaluate the impacts of loosening the provisions. What the Forest Service did here was take that addition to the 2001 rule's provisions for road construction and logging and project that it would yield road construction and logging equivalent to the 2001 rule. And what's the problem with that? Well, Your Honor, X plus 2 does not equal X. You see, I have sort of an overriding problem with your case. You know, if you take a look at this rule that was promulgated in 2008, and I have a question about this, it says the rule does not authorize the building of a single road or the cutting of a single tree. Instead, it establishes permissions and prohibitions that will govern what types of activity may occur in IRAs. And all of this will require appropriate site-specific analysis under NEPA and also applicable laws. Projects will also be consistent with the applicable land management plan components. Now, that's 2008. What's happened since 2008? What's happened since 2008? Under the rule? Well, the Forest Service has approved phosphate mining projects in Idaho roadless areas that would have been prohibited under the 2001 rule. Site-specific projects. I thought the phosphate plan had been approved independently by us. Well, the phosphate plan had a contingent provision that said certain parts of the project won't be able to go forward unless a new roadless rule is promulgated for Idaho. And, of course, the triggering action that allowed those projects, that project to go forward was the promulgation of this rule. But to get to the larger point that I think Your Honor is addressing, yes, this is a programmatic rule. It does not specifically authorize projects. But, of course. Yes, that's right. But, of course, the Forest Service has been arguing before this court for about 30 years that its programmatic decisions don't really matter, and it doesn't have much of a duty to evaluate them under NEPA, and it has not been successful. Going all the way back to Idaho Conservation League v. MUMMA through the cases under the 2001 roadless rule, there's a host of precedent from this court saying if you're making a programmatic decision affecting public lands, you have to do an evaluation of the likely consequences, downstream consequences. Is all that consistent with the Summers case? I'm sorry, Your Honor? Is all that consistent with the Summers case, the Supreme Court Summers case? Pacific Fisheries is now possibly up there. What could Pacific Fisheries do to that? Well, Your Honor, Summers dealt with the issue of standing. Summers says you've got to, in the context of an appeal regulation, you've got to have a site-specific application. That's right. This is a rule that, first of all, is not equivalent to the appeal regulation issue in Summers. But to cut off that argument even on a more fundamental basis, there is a project that already has implemented this rule. It's the one I referred the Court to concerning the phosphate mine. The Forest Service is in the process of authorizing yet another phosphate mine, the Dairy Sincline Mine, pursuant to this. So they have to do a separate environmental analysis of the any additional mining activity? They do, Your Honor. But what's missing from that analysis is it's not going to address the policy choice that was before the agency here, which is, do we keep the 2001 rule or do we take on the Idaho rule? That decision was made in this process, and unless the impacts are legitimately considered here, they never will be. Well, I thought the whole purpose of this Idaho rule was to bring together various competing factions to come up with some agreement on the roadless, you know, inventory roadless rule areas, on how they should be used. That's certainly what the other side is going to tell you, Your Honor. Well, isn't there something to that? I think there is something to that, to the extent that there is some buy-in from some conservation interests, but I think regardless, no matter what the interests are that support the rule, they've got to do a legitimate NEPA process. So there's a we look for is to see whether the agency took a hard look. So where, you know, where is it in here that you can tell me that they didn't take a hard look at the various interests that they had to review and consider? Sure. The two new provisions for logging and road building under the backcountry authorization significantly relax the standards that they were left. But, you know, this is the problem that we always have with these environmental cases, and what the environmental laws say is that the environmental consequences have to be subject to a hard look, exactly as Judge Paya said. But your side frequently comes to us just because they don't like the result. And the question isn't the result. The question is whether a hard look was taken. And given the racknack here and everything that went into this case, this seems to me to be almost a model of a hard look where all the parties come to the table, everybody presents their viewpoints, the fish people, the wildlife people, the caribou people, the grizzly people, everybody under the sun, and they work out a compromise. You know, we've been hearing about this now for the last three years, that compromise is the essence of American democracy. This seems to be a model of that approach. And so where was it, as Judge Paya said, that this failed to take a hard look rather than just you don't like the result? Your Honor, the compromise I think is relevant to the political decision as to whether to adopt this rule, but the compromise has nothing to do with whether they looked at the consequences. It's a hard look. I've read this thing from top to bottom, and it looks like they looked at all of these things extremely carefully, and the result is just something that you don't appreciate. And I can understand that. I might not like it either if I had some of the interests that your side did, too. But that's not a question. Ours is not a policy decision. It's a question of whether a hard look was taken at all of these things that resulted in this. Well, let me address that, Your Honor, because I — Hard look, hard look, hard look. Let's talk about the hard look. Okay. A hard look is not saying we're relaxing these provisions and we're doing it in a very site-specific, surgical way, looking at where we think new uses need to be made of the same thing as the more protective rule that we're discarding. That's where the hard look fails. No, that's where the judgment fails. You don't like the judgment. The question is whether there was a hard look. Your Honor, they can do this. No one's saying there's a law that prevents them from doing this. But you can't say we're relaxing the 2001 rule because we think more needs to be done and then tell the public, don't worry about it. This is going to do the same thing as the 2001 rule. That is not a hard look. Well, they didn't exactly say that. Well, Your Honor, with respect to the backcountry provisions, they said, we're just going to do this. This does more than the 2001 rule, but we're going to project the impacts by carrying forward the logging and road construction level. Well, in your view, what should they have done? You know, what was your alternative analysis with respect to the quantity? Well, Your Honor, they needed to make a reasonable projection of what they thought they needed to use these new authorizations for. So let me so what do you contend should have been the basis for their projection and rather than looking back at what the building that was done under the old rule? Your Honor, they're the ones who said we need these new authorizations because there are needed actions on these lands. Clearly, they had a sense of what needed to be done and where it needed to be done. It doesn't seem that it's asking a tremendous amount of the agency to say, okay, let's have a projection of what that means. They didn't do that. They didn't undertake that process. What they said was, well, it will be at least as much as a 2001 rule, so we'll just carry that forward. And that's a projection. At least as much as a rule that has more protective provisions. Not — it's going to be more than the rule that has more protective provisions by simple logic. And, of course, this Court can — What's the simple logic? The simple — well, I think I said it before. X plus 2 does not equal X. There's — there are new provisions that significantly liberalize the road construction and logging allowances. They have to meet — they did it for a purpose. They mean something. They don't mean nothing. But this analysis assumed they mean nothing. You know, they said on the one hand, this is really important. There's a compelling interest in undertaking these new authorizations. And on the other hand, they said, but public, don't worry. Nothing's going to happen on the ground that's going to be different. That doesn't make any sense. The Court certainly has a role in policing the rationality of the agency's decision making. We've seen it time and again in this Court's precedents. But, you know, the question for us, ultimately, is it arbitrary? Yes. Yes, I would submit it's fundamentally arbitrary. If you look, for example, at the Surface Transportation Board case we cited to you from the Eighth Circuit, you got a situation there where the agency was approving a coal railroad to coal mines. And they did not consider the air quality impacts that would result from more coal burning. And they said, hey, you know, that's down the road. That's too speculative. The Eighth Circuit said, no, the whole purpose of you doing this was to free up more coal to be burnt. That's going to have some air quality impacts. You didn't consider them. You've got to do that. That's a logical extension of your project. Here, they said, we're adding these new authorizations because we think we need more flexibility to do road construction and logging. And then they turn and say, but it's not going to mean anything on the ground. You know, that's the kind of irrational disconnect that this Court can and should police. But you're still not – I mean, so if you were in my position and I was going to – you were going to write something in support of your position, how do we explain it? What would be – what would you say? I would say that the age – there's a fundamental disconnect between the facts found, that we need more flexibility to do road construction and logging on these 5.3 million acres, and the choice made to project that the more protective 2001 rule would – effects would continue. I still don't understand what they did not consider. Well, Your Honor, what they didn't consider was what are the reasonably likely outcomes of adding these provisions for road construction and logging to the – essentially the regulatory framework of the 2001 rule. Well, the district court said, in this case, the Forest Service estimated the rule's impact by relying on data and projections it obtained from each national forest. The information included, one, logging and road projects since 2001, two, any foreseeable future projects over the next 15 years and the likelihood of their implementation based on budget. An interdisciplinary team of experts examined that data and developed projections for future logging and road building based on trends from the existing plans provided by the national forest and from the 2001 roadless rule, and considering the agency's flat budget trend and high interest in responding to fire risk, et cetera, et cetera, they concluded they would not likely see an increase in the foreseeable future for the next 15 years because the appropriated budget is flat or declining. There's no indication the trend will change on and on and on. You've said this four times. I mean, I think that's right. I looked at the record. May I address those things, Your Honor? When you're finished. Yeah. I looked at the record, and it seems to me that that accurately describes what the district court was looking at, what was wrong with what the district court said. Okay. Let's talk about what was wrong with it. What the Forest Service did, that projection, that data call, was for the years 2001 to 2011, what was implemented or projected. What's wrong with that? The Forest Service itself said that data reflects the 2001 roadless rule because it was the direction during that period. So you look at what did the agency plan when it was under the strictures of the 2001 roadless rule? And you say, okay, let's use that as the model for what's going to happen when we repeal the 2001 rule and add new development authorization. That's what's wrong with it. They looked and said, what did the agency do when the handcuffs were on? And then they said, that's what's going to happen when the handcuffs are off. That's what's wrong with it. And in terms of the budget limitation, you know, the agency is very selective about that budget limitation. They say, oh, don't worry about these new authorizations. The budget is going to rob all meaning of them. We don't have any money to do anything. But when they look at the existing plan alternative under the rule, they have supplied the same budget limitation assumption to all the alternatives. Under the existing plan alternative, they say, we're going to have 180 miles of new roads. And the government in its brief says, well, don't worry too much about that. That wasn't really an alternative we were considering. That's just a benchmark for measuring the rule, the Idaho rule. Well, the problem with that is they incorporated those existing plan figures into their analysis of the Idaho rule when they dealt with the general forest provision. So, I mean, you can't have it both ways. You can't say budget limitations are going to deprive all meaning of this rule when you are sweeping in these projections that they made of extensive new roading and logging with those budget limitations. The district court says, while plaintiffs accurately point out that the Idaho roadless rule allows more roads, they offer nothing to challenge the Foreign Service assumption that its lean budget will be stretched thin just to cover maintenance of existing roads and will not allow the construction of any more permanent roads. Moreover, plaintiffs offer no evidence that the projection of an increase in temporary roads from 3 miles to 21 miles under the Idaho roadless rule was arbitrary or capricious. Did you offer anything to challenge the assumption about the lean budget or the projection with regard to temporary roads? Well, yes, Your Honor. We're pointing out that the Forest Service is inconsistent in its application of this budget assumption. You know, it's not like I can say, hey, here's a project you didn't look at. But that's not our burden at this kind of a programmatic level. What we did say was, wait a minute, you're telling us that budget is going to rob all meaning of these new provisions of the Idaho rule, but nevertheless, you're going to be able to go build 180 miles of roads if you implement the existing plan option under the same budget assumptions? That doesn't make any sense. You know, I think there's a role for this Court. It's not just about, hey, you didn't point to a project that they didn't consider. There's a role for this Court to ensure that the agency is acting in a rational manner. And that's fundamentally what we're saying here. Did you want to say anything about the ESA before your time runs out? I do, Your Honor, and I see my time, if I want to reserve my three minutes, is running out. We see the same pattern when it comes to the endangered species issues. The agency, the Fish and Wildlife Service's duty is to prepare a comprehensive biological opinion. If you look at the record, what you see is they were headed toward a pretty difficult determination in that regard, because the species here are to the brink of extinction, 40 individuals. The habitat is severely compromised. You're talking about the caribou? The caribou and the grizzly bears can't take any more erosion of habitat. And so what did they do? They didn't want to make a jeopardy call. So what they did was they got these letters from the Forest Service that basically said, we know we're promulgating this regulation that says new Where does it say we didn't want to make a jeopardy call? Well, if you look at the record, what you see is they say this action is the opposite of what these species need, and they can't take any more compromising of their habitat. So, I mean, the picture is pretty clear. And then they get these letters from the Forest Service, and the Forest Service says, we know the rule says these things that don't sound so good for these species, but don't worry, we don't really mean it, we're not going to do those things. Now, I think the question for the court is, if you've got an action that the agency is considering that promises these adverse effects, can the Fish and Wildlife Service ignore them on the basis of an unenforceable assurance, letter assurance from the agency? You've got a rule in the Federal Register and the Code of Federal Regulations that says one thing, you've got a letter from a forest supervisor who's not even there anymore, that says don't worry about it, we're not going to do it. Has any action yet been taken that might endanger either the caribou or the grizzly bears? Under this. Under this rule? No, Your Honor, it hasn't. Not at this juncture. And if some action is proposed, and they're going to invade that territory, what would your options be to stop that or to have that reviewed? We could challenge the site-specific decision, for sure. And isn't that the appropriate way to do this? Because, you know, this strikes me as lacking rightness at a certain level. Your Honor, I think this Court has time and again said these programmatic decisions are very ripe for consideration in terms of the biological opinions and compliance with the ESA. I don't think that's really a significant issue in the case. And I see my time, I'd like to reserve most of it, but let me just briefly answer that and say, you know, if you look at cases like Conner v. Burford, some of these Courts' other precedents, when you have these programmatic decisions, the burden on the agency is not to the burden on us isn't to come forward and say, look at this project they didn't consider. It's the burden is on the agency to make a reasonable forecast of what the rule is going to mean. And here, the reasonable forecast got cut off by their reliance on these unenforceable letters. Should we wait before we do anything to take a look at what the Supreme Court does in the Pacific Rivers Council application? Your Honor, again, I think the Pacific Rivers Council case is about the standing issue. I don't think this is a close-call understanding. We've got a project that's being implemented right now that is injurious to my clients, and the government hasn't really made a serious charge of the standing issue. Obviously, the Court has its own independent obligations, but I don't think this one is one that is nearly in the category of the Pacific Rivers case, because we're not just saying, look only to the programmatic plan, that's the problem. We also have the site-specific implementation where we say, that's the injury. Robertson, thank you. I'd like to reserve the rest of my time. I'll give you a couple of minutes. I believe the government first. You're going to share some time with them. I'm going to share five minutes with my co-counsel, and so when my time gets down, I'll try and put out a marker for that. What the plaintiff's brief shows, and what their argument here shows, is that this is really a case about what the law allows versus what is actually likely to happen. Under NEPA and under the ESA, the Federal agency's obligation here is to look at a reasonably foreseeable scenario of what is likely to happen in the forests, and not just what the new rule allows. To find the reasonably foreseeable effects of the Idaho rule here, the Forest Service took a two-step rule. Robertson, are you telling us the rule that a lot of terrible things might happen, but they're not likely to happen, so we don't have to do anything? That's right. The Forest Service took a two-step process to see what was likely to happen under the rule. First, it did not do anything. So it's a kind of a trust-us deal. This could be a disaster. I'm exaggerating. But trust us. We don't have any money, and it won't be. We won't let it happen. We won't let it happen. Your Honor, I think the agency's argument actually is that this is not likely to happen because it can't happen. There are existing constraints such as lack of budget to actually build additional roads. So the Forest Service looked at the difference between the legal rules that would apply in these areas, but it also said that the rule is not likely to happen. Is there any case that says a lack of budget that might impede something that could be a real problem is enough to allow something to go forward? Your Honor, I don't think so. Roberts, it sounds awfully arbitrary, maybe even capricious. Budget? What was that? What does that mean? Your Honor, I'm not aware of a case saying that a lack of budget is sufficient protection. But the Court does have plenty of case law, including Northern Alaska Environmental Center, that says what the agency needs to look at is a reasonably foreseeable scenario. In that case, a reasonably foreseeable scenario. Well, but a reasonably foreseeable scenario, doesn't it have to do with more than more with the projects and the environmental stuff rather than, yeah, we just don't have enough money to do it? Your Honor, it has to do with both. I mean, the agency has to make a — take a hard look and figure out what is likely to happen under this rule. And there are plenty of factors that go into that. One is the purpose of the rule. I would disagree, actually, with Mr. Presso's characterization of the purpose. It was not to build more roads, but rather to take the roads that the 2001 rule would allow throughout all 9.1 million acres of Idaho roadless area and focus them where they're really needed in the general forest areas and near at-risk communities that are threatened by forest fire. There was also a purpose of making this process more collaborative so that the Governor's Roadless Commission and other stakeholders could have input into this. All of those don't suggest there are going to be more roads. And, in fact, the Forest Service undertook analysis to decide whether there would be. And an interesting point here is that it wasn't just groups such as the plaintiffs that were urging the Forest Service to project more roads. There were also development interests that said to the Forest Service, we would like you to project higher road building under the Idaho roadless rule so that when we actually submit our plans and make our proposals, it will appear as though these impacts have already been considered. But the Forest Service went out to the forest and said, what do you think is likely to happen, given the amount of budget that you have, given the fact that if even if the budget were to increase, the EIS indicates that any additional money would go towards a large backlog of business maintenance. And the Forest Service personnel said, we don't believe that any more roads are likely to be built under this rule than under the 2001 rule. In fact, that's fully consistent with what the Governor of Idaho said in his original petition to the Forest Service. He said, I expect that the 2001 rule and the Idaho roadless rule will lead to similar management practices in backcountry areas. And, of course, it will lead to additional impacts in general forest areas, which the Forest Service did predict. And, finally, there is a textual provision of the Idaho rule, which is like the textual provision of the 2001 rule, that says there are exceptions to these prohibitions that allow timber cutting and road building to take place in the forests, but we expect them to be applied infrequently. And, Judge Trott, as you pointed out, there will be further site-specific analysis at each stage before any action takes place that might have additional environmental impacts or that might affect endangered species, at which point the plaintiffs' ---- Roberts. Sotomayor, you can't attack a programmatic rule? Trott, Your Honor, I'm not saying that you can't attack a programmatic rule. That's not our position here. Rather, at the programmatic rule you can't attack a programmatic rule. Yes. At this stage, you can. But the agency doesn't have to consider the worst-case scenario at the programmatic stage. It just has to consider that reasonably foreseeable scenario. And the courts have recognized that plaintiffs will have an opportunity at later stages if those ---- Alito, and what's your best case for the proposition that you just forwarded? Trott, I'm sorry. Alito, your best case for the proposition that you just said. Trott, I would say that the Court should look particularly carefully at Northern oil and gas leasing in a wide area in Alaska. But the Court said it only has to ---- that rule would have allowed much more oil and gas leasing than BLM had anticipated ---- had forecast in its EIS. But the Court said BLM only has to look at the ---- a reasonably foreseeable forecast. And it applied that holding both to NEPA and to the ESA. The ESA, actually, is a particularly salient example of this because it contains legally binding requirements. If the Forest Service's ---- if the assumptions, I'm sorry, that the Fish and Wildlife Service used in the biological opinion will change, or if the Forest Service changes its practices, the ESA requires those agencies to reinitiate consultation to make sure that whatever the new scenario is that the Forest Service didn't anticipate and analyze in the EIS will also have no adverse effect or cause jeopardy to endangered species. That happens automatically. And before any site-specific proposal can take place, there will be additional consultation under the ESA or additional environmental analysis under NEPA that will be able to fully analyze whatever impacts those may have. Kennedy. How does this rule work in conjunction with, say, like the forest management plans that exist? In two ways, Your Honor. One is that any roads that are built anywhere in these IRAs have to comply with directions in the forest management plans for mitigation, for protection of species, and things like that. The rule explicitly preserves those provisions. The other way that it interacts with forest management plans is in general forest areas. Under the Idaho rule, the forest management plans really dictate what is allowed in general forest areas, which I think amounts to about 5 percent of inventory roadless areas in Idaho. So those plans are still relevant and do constrain the Forest Service. In some cases, those plans have binding requirements. For example, Mr. Prezzo mentioned that the Forest Service can affect caribou habitat. And that's true throughout the Idaho Panhandle National Forest as a whole. But the Panhandle National Forest has areas, Management Area 7, where management plan components do step in and say no harvesting at all of old-growth cedar stands. So wherever the forest management plan has those protections, the protections will carry forward. So just to back up for a second, you're citing the Northern Alaska Environmental Center v. Lujan case? That's our case? It's the, yes, the 2006 or 2008 case. There are two Northern Alaska Environmental Center cases, and I'm citing a later one. Could you address their challenge to the Weingartt-Hull classification? Sure. As we indicated in our brief, the first answer to that question is that it simply wasn't raised at the time of the draft EIS. Now, at the draft EIS, the Forest Service made clear that it was going to put Winnegah Hull in the primitive category based on the State's recommendation. In the final EIS, the Forest Service did add an additional justification, that the Wyoming Wilderness Act was not intended to cover the Idaho portion of Winnegah Hull, and therefore, that was a reason why the Forest Service concluded that Congress had not taken the affirmative step of trying to protect that area. Now, it's true that because that particular reason wasn't in the draft EIS, the plaintiffs would not have had an opportunity to comment on that particular reason. But the draft EIS clearly had sufficient reasons based on the State recommendation that plaintiffs had an opportunity to comment on and did not to put the Winnegah Hull area in the primitive designation, and that is sufficient to support the decision that the Forest Service made. So what's the rationale again for including it? For including it in the primitive designation? Yes. Well, the primitive designation seemed appropriate because of the characteristics of the area. It is more protective than would have occurred under the 2001 roadless rule, and that was what the State had recommended. You'll see in the EIS that's available in the excerpts of record that the Forest Service actually went through each area and described the characteristics of that area and why it was making the decision that it did as to the theme that that area would be governed under in the Idaho roadless rule. If I could for a minute, I'd like to go to a question that Judge Trott asked at the beginning of Mr. Prezzo's presentation, and that is what has actually happened in the forests since 2008. Now, this is not an issue that the Court can take into account, as it's aware, when it's trying to decide whether the Forest Service had a reasonable basis for the EIS. But it actually is relevant to another issue, and that is the issue of remedy. If the Court decides that there's some kind of procedural fault in the EIS that the Forest Service needs to go back and reconsider, the government's position is that remand without vacature is the appropriate course. That is, that the Court should leave the rule in place while the Forest Service has a chance to reconsider whatever issues the Court identifies that require that. Now, the question under whether the Court should remand without vacature is the equities. And in particular, is it going to cause harm in the forests to leave this rule in place if the Forest Service does need to reconsider any part of it? And on that point, I'd like to just offer the Court some facts that may help. These are compiled by the Idaho Governor's Roadless Commission, which reviews all proposals for activities in inventoried roadless areas under the Idaho rule. It updated its report, which is publicly available on the Web, in June of 2012. And it found that in the four years since the record or are you asking us to take judicial notice of it? It's not in the administrative record because it wasn't available at the time. But if the Court is going to consider the equities of whether the rule should remain in place, then it is relevant to the question of will the Idaho rule cause harm in the meantime. The Governor's Roadless Commission found that there had been no new roads built under the Idaho roadless rule in the four years in which it's been in place, and that all the timber cutting that's taken place under that rule would also have been So the harm of leaving this rule in place, if it does need to be, if it does need to be reconsidered, is really minimal. Also, of course, any site-specific development that may take place under the Idaho rule at that time will have the opportunity for further analysis, whether it's ESA consultation for any activities that may take place in areas that are critical to caribou or grizzly bears, or whether it's NEPA analysis in the question of site-specific proposals for things that will happen in any other area. I'd also like to address for a minute the ESA issue that the Court and Mr. Prezzo had a colloquy about during his argument. This goes back to the question of what do the rules allow versus what is likely to happen. And here again, it was the Fish and Wildlife Service's responsibility to base its analysis on a reasonably foreseeable scenario of what was likely to happen in the forest. As Judge Windmill pointed out in his opinion, the Forest Service has an obligation to the Fish and Wildlife Service has an obligation under the regulations to consider all relevant information that the Forest Service gives it about what is likely to happen in those forests. And I don't think that plaintiffs can really raise any genuine dispute about the fact that the Forest Service's own expectations about how it is going to manage the forests going forward is relevant information that the Fish and Wildlife Service can take into account. You're talking about the letter assurances? I am talking about the letter assurances. That's one of the things that the Fish and Wildlife Service looked at when it was trying to decide what is reasonably likely to take place in these forests and will it adversely affect caribou rescue efforts. There's nothing binding about those assurances, right? There's nothing binding about them except in this sense. If the scenario under which the Fish and Wildlife Service analyzed the roadless rule were to change, then ESA regulations require the Forest Service and the Fish and Wildlife Service to reinitiate consultation. So there's nothing binding the Forest Service to carry out the assurances that it described in its letters. But if the Forest Service doesn't carry out those assurances, there is an additional step that has to take place in order to ensure the safety and no jeopardy to the endangered species that are at issue. So the letter assurances are, what, just informative? In effect, yes. They are informative. They describe the Forest Service's predictions about what's likely to take place in these forests. And in this case, the predictions were short-term. They were very specific, and they were based on information that the Fish and Wildlife Service could independently verify, like the content of the access amendment affecting movement of motorized vehicles in grizzly bear areas. That was a rule that was in process that the Fish and Wildlife Service could go and look at, and that actually, since the record in this case was closed, was promulgated. The access amendment. The access amendment, yes. So has that had any effect on the existing BIOP? I don't believe that they went back and reconsidered the existing BIOP in light of the access amendment, but the Fish and Wildlife Service did also consult on the access amendment and concluded that it would not cause jeopardy to grizzly bears. And in addition, I'm not aware of any projects that have taken place in grizzly bear areas since then, either under the access amendment or under the Idaho rule. Were there any challenges to the access amendment? Your Honor, as I stand here, I'm not aware of any, but I'm not 100 percent sure whether there have been or not. Okay. I see that you want to make sure your counsel has to say that I'm getting down to five minutes, so unless the Court has further questions, we'll simply ask that you affirm the judgment of the district court. Okay. Thank you. May it please the Court, my name is Julie Wise, and I represent the Kootenai Tribe of Idaho. My remarks this morning, however, are made not only on behalf of the tribe, but also on behalf of the State of Idaho, the Idaho Association of Counties, and the Idaho Mining Association. I'll refer to those entities as intervenors, even though they have the dual amicus intervenor capacity in this case. Intervenors joined the Forest Service, Your Honors, in asking this Court to affirm the roadless, the Idaho roadless rule in its entirety. And frankly, this coalition of intervenors and amici that has come before the Court is worthy of note. It is not simply a political coalition that you should pay attention to, but it's also a legal coalition, and that is because of the compromise that this coalition brought about. The Idaho roadless rule was spearheaded by the State of Idaho under the leadership of then-Governor Risch. The Senator now, Senator Risch, is with us today, not just because he finds Portland more enjoyable than D.C., but because he believes in the important change in management for Idaho roadless rules, roadless areas that is inherent in this rule. Also with us today is the Kootenai Tribes tribal chairperson. We have Jennifer Porter with us today, and a tribal council member, Velma Bahe, is with us as well. They came here from Idaho because they also recognize that this is a sea change in the way to manage these Idaho roadless areas. And this is important, Your Honors. It's important because this collaborative process that brought together the state, Indian tribes, conservation groups, national conservation groups like Trout Unlimited and the Idaho Conservation League, that led to compromise, Your Honors, compromise. And this Court held in the Northwest Environmental Advocates v. Nymph's case at 460 F. 3rd, 1125, that there is – it buttresses the NEPA hard look if an agency does not simply stake out its position and turn a blind ear to – or blind eye, a closed ear to input from stakeholders. What that says is that the agency is willing to make compromises. Therefore, this political coalition that came together with very real interests in making this – this pragmatic rule work on the ground, the refinement that it led to in the rule is worthy of note and has legal consequences under NEPA. It buttresses that NEPA hard look. There are many people in this courtroom today. I can't tell you how many different interests are with us. I would like you to know that the Boundary County Commissioner Dan Denning, who is currently serving on that Implementation Commission, is with us. We have Alan Prouty from the Idaho Mining Association. He sits next to Mr. Denning and serves also on that Implementation Commission. And why is that Implementation Commission important, Your Honors? It's because it is a diverse group of interests that looks at any site-specific project that is proposed. And, Judge Trott, you asked if in the record we had anything from that Implementation Commission. We do have in the amicus brief of the Idaho Association of Counties and Idaho Mining Association at Exhibit B the printout from that Implementation Commission. So you can take a look at that to see, well, what has been – what has been proposed in the four years since the Idaho Roadless Rule issued? What has happened? And you'll see, for example, if you look at Exhibit B to that amicus brief at page 2, that there have been some projects that, for example, want to protect community protection zones. Some road building is under consideration, a fuel break to protect a community protection zone is under consideration. Only a few things have actually been approved, but there's a lot under consideration. And it's very important to recognize that in the four years since this rule issued, the sky hasn't fallen on Idaho roadless areas. And that's because you have these people who have come together to solve this contentious dispute about how to manage roadless areas in Idaho, and they're trying to work it out on a daily basis. Judge Pez, I believe it was you who said, you know, isn't this what we want people to do in the natural resources arena? And, frankly, for all of us who practice in the area of natural resources law, we are – we applaud the Idaho Roadless Rule. The Idaho Roadless Rule is a model of how these diverse interests should come together to try to solve these disputes. The Trout Unlimited and Idaho Conservation League brief talks about the fact that when you have diverse interests come together like this, you can end up with a rule, a way of managing roadless areas that will be – people are invested in, and it will be long lasting, and it will be durable. So, Your Honor, this coalition is not just a political coalition. It is a legal coalition, and it is very, very protective. Roberts. What standing were you given in the trial court? Excuse me? Is there a remaining issue as to whether you should be allowed to be interveners? Your Honor, we were interveners as to the remedy only in the trial court. And we – unless you have questions about the intervention appeals, we will not talk about that. But I would urge the Court, based on the intervening change in decisional law wrought by Wilderness Society and the abandonment of the district court, to reconsider the case. Breyer. Our law has changed on that. Yes, it has. Since the district court's ruling. That's right. And, Your Honor, we simply didn't have a time – didn't have a chance to ask Judge Windmill to reconsider because his opinion issued two weeks after Wilderness Society came out. I would note, however, that there was another intervention case in which he had issued an identical – basically identical intervention ruling. Exactly what are you asking us to do on that issue? Reverse the district court based on an intervening change in decisional law. Only if we were to reverse. That's right, Your Honor. Right. We don't – if we affirm, it's – the intervention issue is just moot. Well, Your Honor – Well, it may not be moot if you – if somebody asks for an end bank or goes to the supreme court. That's right, Your Honor. We would like to be full interveners, although it is our hope that this case is coming to an end. It's been going on for a long time. Things are going well in Idaho. And it's simply – I would like to address the – But I guess you could get an intervention on appeal. Yes, Your Honor. You could – we could be granted intervention on appeal. That would certainly be acceptable to the interveners. Your Honor, I would like to point out that there is in the record – the Idaho Roethlis Rule EIS did predict more foreseeable activity in certain Roethlis areas. I think Mr. Presso said – basically the Idaho Roethlis Rule said the standard would – the status quo would be maintained. I would refer you to the excerpts of record at 408 through 419. That's the FEIS table S-2, where the reasonably foreseeable activities are laid out under all of the possible management regimes. You can actually see under the 2001 Roethlis Rule. You can see under the Idaho Roethlis Rule. You can see under the forest plans. And it is not the same. But as my co-counsel indicated, basically what happened is the freedom to engage in some limited road construction, temporary road construction, and timber harvest was moved between the two. It's starting to exceed your time. Thank you, Your Honor. Okay. Thank you very much. We appreciate your argument. Let's see. You have a few minutes for – I'll give you two minutes for rebuttal. Yes. Thank you, Your Honor. Just a few brief points. Government counsel says the intent of the Idaho Rule was essentially to manage similar to the 2001 Rule. I'd refer the Court to the Forest Service's own Federal Register Notice on the proposed Rule. It's page 382 of the principal excerpts of record, where the Forest Service says the Department and the State intend to provide flexibility beyond the restrictions imposed by the January 12, 2001 Roethlis Area Conservation Final Rule. So, repeatedly what they said is, we're going to manage like the 2001 Rule with additional flexibility to do these projects. What we're focusing on is the with additional flexibility means something. It doesn't mean nothing. The Northern Alaska case that government counsel referenced, it's a case where the Court, just like in the Connerby-Burford case, the Court said, when you're doing an Endangered Species Act analysis and you don't know what the scope of the downstream authorization you've made is going to be, you need to make a reasonable projection of what that downstream authorization is going to look like. The point of that is to flesh out the downstream authorization. Here, they say, we're not going to look at the downstream authorization. Because we got a letter in our hand from the Forest Supervisor that says we don't really, we don't really mean it. And that, you know, that's our fundamental problem with the case. That's why it's different from Northern Alaska. Northern Alaska, you do the projection to fill out the picture. Here, they cut off the filling out of the picture. I'm based on an unenforceable letter. You know, if I come into this Court and say, Your Honor, they said they can't do this. There's a letter. Obviously, this Court's going to say, how did you get, how did you get in here? You know, that's not a contention that's going to carry the day. And that's what they're relying on to say, don't worry, the grizzly bears and the caribou are going to be fine. Now, as to the issue of subsequent ---- Roberts. I'm sorry. With respect to the letters, are you relying on National Marine Fisheries? National Marine Fisheries Service, the Judge Thomas's ---- Wildlife? Yeah, Judge Thomas's opinion. The district court said, well, that's different from this case, because there's nothing immediate. The immediate negative effects on a listed species presented in national wildlife do not exist in the present case. Is that wrong? Well, Your Honor, I don't ---- respectfully to the district court, I don't think that's ---- that was really what the National Marine Fisheries Service turned on. I think that's kind of looking through the ---- sifting through the details of that case to find a distinction I don't think is there. But beyond that, let's look at the Center for Biological Diversity case this Court referred to just within the last few weeks, where the Court says if you are going to rely on a conservation measure, it's got to be part of the agency action. The agency action here is the Idaho roadless rule. And, Your Honor, I see I'm over time. You can answer Judge Scott's question. The agency action here is the Idaho roadless rule. It's not the letter. And, you know, we're not the first people to make this point. If you look at the record, Interior Department counsel said the exact same thing that this Court said in the Center for Biological Diversity case, this is page 1014 of the excerpts of record. The action FWS is consulting on is F.S.'s adoption of a rule. FWS's consideration of the effects of that action must be governed by what the rule says, not by informal, nonbinding statements made in ancillary documents. That's what Interior counsel said. What did they do? Ultimately, they said, well, we're going to rely on the informal, nonbinding statements made in ancillary documents. That's the problem. Okay. I thank you for the Court's attention this morning. We ask you to reverse the decision below. Okay. Thank you very much. Thank you, counsel.  It's an interesting case. The matter is submitted.
judges: Alarcon, Trott, Paez